### Orient Insurance Company v. A. T. Wingfield.

#### Decided February 12, 1908.

**1.—Fire Insurance—Payment of Premium.**

The actual payment of the premium on a policy of fire insurance is not essential to the validity of the contract in the absence of a stipulation in the policy to that effect and in the absence of some limitation upon the authority of the agent of the insurance company to contract for insurance on a credit, and avoiding the policy if the premium be not paid.

**2.—Same—Contract of Renewal—Evidence.**

Upon the issue whether or not a contract was entered into between the plaintiff and the agent of an insurance company for a renewal of a policy of fire insurance when the same should expire, evidence set out and considered, and held sufficient to support a finding of the jury that such a contract had been made and that the insurance company was bound thereby.

**3.—Same—Same.**

When the contract is to renew a policy of fire insurance and there is no evidence of new or additional terms, the presumption is that the renewal is to be in the same company, for the same time, terms, amount, premium, and on the same property as the old policy. The very request to renew a policy implies that the new policy shall be exactly like and similar to the old policy.

**4.—Same—Contract of Renewal.**

An action may be sustained upon a contract to renew a policy of fire insurance, and in the absence of evidence to the contrary, the implication arises that the renewal is upon the same terms and conditions as stated in the old policy and for the same amount.

**5.—Same—Payment of Premium—Waiver—Evidence.**

In ascertaining whether or not the payment of the premium has been

waived upon a contract for the renewal of a policy of fire insurance, the habit and custom and course of dealing between the assured and the agent of the company, may be looked to.

**6.—Conflicting Testimony—Province of Jury.**

Although the testimony in a case may·be·conflicting and totally irreconcilable, the jury have the right to accept the testimony of one party and to, discard that of the other, and to render a verdict accordingly.

**7.—Fire Insurance—Renewal of Policy Before Expiration.**

A policy of fire insurance contained the following provision: "This policy may, by a renewal, be continued under the original stipulations, in consideration of premium for renewed term, provided that any increase of hazard must be made known to this company at the time of renewal, or this policy will be void." Held, not to prohibit a contract, for the renewal of the policy, several months before the expiration of the same.

**8.—Charge—Fuller Instruction—Practice.**

A mere suggestion to the court is not sufficient to require the court to submit an issue to the jury. To place the court in default, a charge should be prepared, properly presenting the issue desired to be passed upon, and the court should be requested to give the same.

**9.—Fire Insurance—Accrual of Interest.**

The amount due upon a policy of fire insurance should bear interest from the date when it is made payable in case of loss. When the loss is made payable by the terms of the policy 60 days after proof of loss, this fixes the maturity of the contract. In case of proof of loss is waived, interest should run from the date of the waiver.

Appeal from the District Court of Tom Green County. Tried before Hon. J. W. Timmins.

*Crane & Gilbert,* for appellant.

*Hill & Lee, Rhodes S. Baker* and *F. M. Etheridge,* for appellee.

FISHER, CHIEF JUSTICE.—This is a suit by the appellee against the Insurance Company to recover the sum of $2000 with interest on a contract for the renewal of a policy covering $1000 on stock of merchandise, including drugs, notions, etc., and $1000 on soda fountain, mirrors, attachments, etc., located in a building on a certain lot in the city of San Angelo.

The property described was covered by an insurance policy issued by the appellant on March 28, 1904, which expired March 28, 1905, in favor of the Lee Wilson Drug Company. On August 16, 1904, the appellee Wingfield bought all the stock of goods, consisting of drugs, etc., and property covered by the policy of insurance from the Lee Wilson Drug Company; and at that time he made an agreement with Mr. Ions, the agent of appellant, that the policy could be transferred to Wingfield, which was done. At the time of this transfer the plaintiff contends that there was an agreement entered into between him and the agent Ions, for a renewal of the policy on the same terms and same premium, covering the same property, when it would expire on March 28, 1905. It is also claimed by the plaintiff that on the day before the policy expired he and the

agent Ions had a further understanding with reference to the policy, and it was expressly agreed that the policy should be renewed on a three percent premium. It seems that this policy was never actually renewed according to either of these agreements, by the issuance of a policy in lieu of the old one and the delivery thereof to Wingfield.

On March 1, 1906, a fire occurred which destroyed the property previously described as covered by the old policy. The trial court in its charge to the jury submitted to them the question whether there was an agreement and contract entered into in August for the renewal of the old policy; and also whether there was an agreement and contract entered into in March for a like renewal of the old policy, and instructed the jury that if they should find in favor of the appellee on either of these contracts, then to return a verdict in favor of appellee for the amount sued for with interest from the time that the fire occurred. In response to these instructions a verdict was returned for the appellee for the sum of $1940 with interest.

It is contended by appellant that neither of the supposed agreements entered into constitute a contract of renewal, and as to the supposed agreement of March 27, the evidence shows that the minds of the parties never met, consequently there was no mutuality. It is also contended that no premium was paid. As to the latter contention we desire to say that it does not appear from the terms of the policy that payment of premium, in money or cash, was made essential to its validity; and there is nothing upon the face of the policy that limits the right of the agent representing the Insurance Company to contract for insurance on a credit. There is nothing upon the face of the policy that absolutely requires a policy or a contract of insurance to be in writing; and there is no provision avoiding the policy if the premium is not paid.

Upon the subject of payment of premium the testimony of the plaintiff Wingfield leaves that question in some doubt; that is, as to whether there had been a settlement between him and Ions as to the premium. But it appears from the amount of the verdict that the jury must have allowed the appellant credit for the amount of premium due. The plaintiff in his petition offered to allow this sum. Ions' testimony is to the effect that the premium was not paid. But the plaintiff testified that Ions had been in the insurance business in San Angelo ever since the plaintiff had lived in that city, where he seems to have resided for a number of years; that the custom of doing business between him and Ions was that Ions drew policies for him and collected when he felt disposed to present the bill; that plaintiff would pay when he felt disposed to; that Ions was a customer of his in the drug business, and that a method of offsetting premium accounts with drug accounts had existed ever since plaintiff had been in business for himself at the Central Drug Store, which was some years before he purchased the Wilson stock; that his relations with Ions were friendly and still were; that Ions was the agent of the Orient Company when plaintiff bought the Wilson stock; that he carried its blank policies and issued policies, and that the old custom of doing business still existed

between him and Ions after plaintiff bought the Wilson stock with respect to Ions keeping up the plaintiff's policies and issuing them and collecting and offsetting bills for premiums against plaintiff's bills against him; that Ions' office was in plaintiff's store, and that Ions agreed to renew Wilson's policies at their expiration. It seems from the evidence that there were three policies on the Wilson stock when the plaintiff bought it, one of which was the policy in the appellant's company. The other two policies were renewed by Ions, but he failed to renew the policy in question. Ions was the local agent of the Orient Insurance Company in San Angelo, and had been for about twenty years; that he was the agent of many other insurance companies, and the evidence shows that he had the authority to make contracts of insurance and to issue policies and to renew policies, accept risks and collect premiums; and, in fact, to perform the duties generally exercised by insurance agents.

In addition to the facts as stated we set out the following evidence, which justifies the conclusion that the contracts for a renewal of the policy in question were entered into between the appellee and the agent Ions. As to the first agreement the witness Ions testified as follows:

"Q. At the time of the transfer of the Orient policy (from Wilson Drug Co. to Wingfield) did not you and Mr. Wingfield have an agreement that all of the policies which were transferred to him by the Lee Wilson Drug Company, and which had been written by you, were to be kept up and renewed as they expired?

A. Yes.

Q. Is it not true that at the time of said transfer you asked him about the policy on the soda fountain written in the defendant company and now sued upon in this action, and he told you that he wanted you to keep that policy up and renew it, and that you agreed to do so, and that he explained to you the reason why it was important to keep up that policy?

A. Yes.

Q. Is it not a fact that you understood from the negotiations between you and Mr. Wingfield at the time that the transfer was made of the Orient Insurance policy by the Lee Wilson Drug Co., and the assent of the company thereto, about August 16, 1904, that you were to keep up said policy by renewal at its expiration?

A. Yes.

Q. Had Mr. Wingfield been out of town at the expiration of said policy, and you say that you would have renewed the same, then is it not a fact that you would have renewed it under an agreement and understanding with Mr. Wingfield made by you at the time of the transfer of the Lee Wilson Drug Company?

A. Yes.

Q. When you have instructions to renew a policy, for what length of time is your renewal written?

A. For one year.

Q. What are the terms when you write a new policy like the old one; or do you write a new one?

A. Write a new policy.

Q.    But it contains the same terms?

A.    Just exactly.

Q.    One is the duplicate of the other?

A.    Yes, sir.

Q.    And the expiration is the same?

A.    Yes, sir.

Q.    For the same length of time as the old one?

A.    Yes, sir.

Q.    If Mr. Wingfield had not been in San Angelo on the 28th day of March, 1905, would you or not have renewed that policy?

A.    I would have renewed it emphatically without question.

Q.    Is it not a fact that during the five or six years which you have been writing insurance for Mr. Wingfield, both while he was part owner in the Central Drug Store and during the time he was running his own drug store, that you and he ran open accounts, you buying from him drugs and druggist articles, and he from you insurance?

A.    Yes.

Q.    Is it not true that during this time you would have settlements or partial settlements, one crediting the account in the payment of the account of the other?

A.    Yes.

Q.    Is it not a fact that these accounts or partial payments were made at irregular intervals?

A.    Yes.

Q.    Is it not true that after Mr. Wingfield bought out the Wilson Drug Store that you also kept your office with him, and rents thereafter, as a rule, were paid in insurance?

A.    Yes, but my rent was more often paid direct in money, as insurance policies were only written once a year.

Q.    Is it not a fact that the policy in the Orient Insurance Company sued upon in this case, is of the regular New York Standard form?

A.    Yes.

Q.    Mr. Ions, that commission you speak of giving you authority to renew policies—will get you to state what was the customary rule of renewing policies; that is, did you issue new policies or issue certificates?

A.    I reissued policies; there are no certificates at all. Fire insurance policies are reissued.

Q.    And that is what that was intended to be?

A.    Yes, sir.

Q.    You have already described how you actually carried on your business under your commission with the company in your depositions?

A.    Yes sir."

Plaintiff Wingfield testified:

"Q.    Will get you to state, Mr. Wingfield, whether you had any agreement or understanding with this company through Mr. Ions, with respect to renewing this policy when it should expire?

A.    Yes, sir.

Q.  State what that agreement was.

A.  When I bought the stock from Mr. Wilson and the insurance was transferred, I told Mr. Ions that I wished him to renew and keep the policy in force and never to let them drop, which he consented to do as he always done in my work.

Q.  Did you make any explanations to Mr. Ions why you wanted to keep the policy in force?

A.  Yes, for this reason:  When I bought the Wilson stock I borrowed money and assumed an indebtedness on the fountain.  For these two reasons I asked him to keep the policies in force.

Q.  You stated that to Mr. Ions?

A.  Yes, sir.

Q.  Now, Mr. Wingfield, these other policies in the other companies that were carried by Mr. Ions, when they expired what did Mr. Ions do with reference to renewing them?

A.  He renewed the policies and gave them to me.

Q.  At the time you had this understanding with him about renewing this and other policies, you then had this policy in hand?

A.  Yes, sir.

Q.  Had you looked at it?

A.  Yes, sir; I had just looked at the name and amount.

Q.  You knew the amount and how it was divided?

A.  Yes, sir.

Q.  Did you know the rate?

A.  Yes, sir; three percent, I think.

Q.  Was this one of the policies that was to be renewed?

A.  Yes, sir.

Q.  Was it a policy for one year?

A.  Yes, sir.

Q.  What was Mr. Ions' customary manner of renewing policies when they would expire?

A.  He would issue me a new policy.

Q.  Issue you a new policy of the same character and deliver that to you?

A.  Yes, sir.

Q.  Was there any uniform custom of doing business between you and Mr. Ions prior to your buying the Wilson stock with reference to issuing policies and collecting premiums?

A.  He drew policies and collected when he felt disposed to present me his bill.

Q.  Would he insist upon the paying of the premiums when the policy was delivered?

A.  No, sir.

Q.  How would you do about the charge and collecting of the premium?

A.  I would pay when I felt disposed to.

Q.  Was Mr. Ions a customer of yours in the drug business?

A.  Yes, sir.

Q.  Did he have any account with you in that?

A.  Yes, sir.

Q.   You also had a settled method of offsetting premium accounts with drug accounts?

A.   Yes, sir.

Q.   How long had that custom existed?

A.   Ever since I had been in business for myself at the Central Drug Store.

Q.   I will get you to state whether the old custom of doing business still existed between you and Mr. Ions after you bought the Wilson stock; that is, with respect to his keeping up your policies, issuing them and collecting later.   Did he continue that?

A.   Yes, sir.

Q.   Did you continue to offset one account against another as before?

A.   Yes.

Q.   When you presented your bills to Mr. Ions he paid them; and when he presented his bills to you, you paid them?

A.   Yes, sir.

Q.   Did he continue to carry the bulk of your insurance?

A.   Yes, sir."

As to the second agreement, the testimony is as follows:

"Plaintiff testified (speaking of the second conversation concerning the Orient policy had the day before its stated expiration) as follows:

Q.   What was that conversation?

A.   Mr. Ions was seated at his desk; I walked down to the counter and he said: 'Wing, this policy of Orient expires tomorrow.'   I said: 'What's the rate?'   He said:   'Three percent;' and I said:   'Renew the policy, Mr. Ions,' and he returned to his desk.

Q.   Did he say anything?

A.   I understood him to say yes, and I walked back behind the counter.

Q.   Did he give any other sign or assent than saying yes?

A.   He nodded his head and turned back to his desk; I walked back to my work."

Ions testified:   "I was officing in the same building with Mr. Wingfield, and on the 27th of March, the day before the policy expired, I called Mr. Wingfield up.   He was in the store and I called him up to my desk and said:   'Wing, that Orient policy expires tomorrow,' and I think I said, 'Shall I renew it?'   Mr. Wingfield walked to me, put his back against the counter, looked towards the soda fountain and said:   'What's the rate?'   I said three percent, and understood Mr. Wingfield to say, 'Don't renew it,' and turned to my desk, took up the expiration book before me and marked on the policy, 'dropped.'

Q.   How is your hearing?

A.   Very defective; stone deaf in one ear.

Q.   Talking at that distance, couldn't you have been mistaken as to what Mr. Wingfield said?

A.   Of course I could."

We have not set out all of the evidence of these witnesses, but

have set out so much as we deem necessary to show that there was evidence to justify the trial court in submitting the contracts to the jury, and evidence sufficient to support the verdict and the judgment below.

In this connection we will dispose of the contention of appellant that the evidence does not show a definite contract of renewal in this particular company; that Ions was the agent of many companies, and that in order to determine a liability of the appellant's company, the evidence creating the contract to renew must show that the renewal was intended to cover a policy in this company. In reply to this it is clear that the evidence justifies the conclusion that the contract was not merely to renew an insurance, but to renew the old existing policy in appellant's company. When the contract is to renew a policy, and there is no evidence introducing new or additional terms, the presumption is that the renewal is for the same time, terms, amount, premium and to cover the same property as the old policy. (Western Assur. Co. v. McAlpin, 55 N. E., 121, 122; Commercial Ins. Co. v. Morris, 18 So., 35; Wiebeler v. Milwaukee Ins. Co., 16 N. W., 363.) The very request to renew a policy implies that the new policy shall be exactly alike and similar to the old policy.

As to the questions of premium, contract of renewal and measure of damages, we cite the following cases: Baldwin v. Phoenix Ins. Co., 54 S. W., 13; German Ins. Co. v. Goodfriend, 97 S. W., 1098; King v. Phoenix Ins. Co., 92 S. W., 892; Home Ins. Co. v. Adler, 71 Ala., 516; Commercial Ins. Co. v. Morris, *supra;* Western Assurance Co. v. McAlpin, *supra;* Squier v. Hanover Ins. Co., 57 N. E., 93; King v. Hekla Ins. Co., 17 N. W., 297. Other cases to like effect could be cited.

We will not undertake to quote from the opinions delivered in the cases mentioned. On evidence establishing contracts of renewal of less force than the facts stated in this record, these cases hold: First. That the action may be maintained, not upon a policy, but upon the contract to renew the policy; and that in the absence of evidence to the contrary, the implication arises that the renewal is upon the same terms and conditions as stated in the old policy, and that the amount of insurance to be paid in the event of loss shall be the sum stated in the old policy. This being the measure of damages when there is a total loss and no change in the property or its value.

Second. It is further held that in the absence of agreement to the contrary, the presumption will be that when a contract to renew is made it is contemplated that the same terms, time and premium as formerly existed should apply to the contract of renewal.

Third. It is also held that the payment of premium is not essential to the validity of such a contract; that in ascertaining whether the premium has been paid or waived, the habit and custom and course of dealing between the assured and the agent of the company may be looked to.

The principles of law announced in these cases are applicable to the facts of this case. From this conclusion it necessarily follows that appellant's first, second and third assignments should be overruled. In addition to this ruling we will also notice an objection urged under the second assignment. It is contended that no force can be given to the agreement between Ions and appellee from what occurred in their interview on March 27, 1905, because it appears, so the appellant contends, that there was no mutuality of agreement on that occasion; that Ions understood one thing and Wingfield another—that the minds of the parties never met upon the proposition that the policy should be renewed. The court submitted to the jury the question as to whether a contract was entered into at that time, and we take it that this charge was broad enough to lay the whole question before the jury, and to permit them to determine if there was a conflict in the evidence which one of the parties they would believe. Personally, the writer believes that both parties testified as they understood the matter, and that neither would intentionally misstate or misrepresent the true facts. But, however that may be, we are not responsible for the verdict of a jury in refusing to reconcile conflicts in evidence, or in determining the credibility of witnesses, and the weight they will give certain evidence. There was a conflict in the evidence of the plaintiff and the agent of appellant upon this subject. The jury have determined that conflict in favor of the testimony of the plaintiff. If they believed the plaintiff, then his evidence upon that subject was sufficient not only to establish the agreement entered into between him and Ions, but was sufficient to show that Ions, notwithstanding his denial, understood it as the plaintiff understood it, and accepted the proposition of renewal made by the plaintiff. This is not a new question in this court. We have had it before us on several occasions, notably in the case of American Freehold Land Mortgage Co. v. Pace, 23 Texas Civ. App., 248, and Aetna Ins. Co. of Hartford v. Brannon, 91 S. W., 614. In the first case cited a writ of error was refused. In those cases, in determining whether there was mutuality of agreement, and in passing upon the question as to whether or not the jury had evidence before it sufficient to establish that fact, it was held that although the plaintiff and defendant would not agree in their testimony as to what was the contract, and one would expressly deny the evidence of the other, that the jury in passing upon the question as to what was the contract, or what was embraced within its terms, could base their conclusion solely upon the evidence of one witness and ignore that of the other.

Further, an objectionable feature of the charge set out under the second assignment, which was requested by the appellant and refused, is that it ignores entirely the existence of the contract of August, 1904, which has some evidence tending to establish it.

The third assignment also complains of the action of the court in refusing to give an instruction to the effect that the jury should ignore the contract or agreement entered into in August. This charge is on the weight of evidence and is disposed of by our findings of fact.

It is contended in an instruction which was requested and refused, set out under the fourth assignment of error, that the policy in effect prohibited a contract of renewal until the expiration of the policy, or near that time. The provision in the policy referred to does not bear the construction placed upon it by the appellant. There is nothing there prohibiting a contract of renewal to be entered into prior to the time the original policy expired. Practically the same question was raised in Baldwin v. Phoenix Ins. Co., 54 S. W., 13. It was there held that the mere fact that a contract to renew was entered into several months prior to the expiration of the existing policy would have no effect upon the validity of that agreement.

Our findings of fact and what we have just said dispose of the fifth and sixth assignments of errors.

There was no error in the third paragraph of the charge, as complained of in the seventh assignment. It was a correct presentation of the law, and if the facts were as stated in that charge, the defendant was entitled to a verdict. This charge is to be taken in connection with the other charges of the court, and is not to be confined to the narrow limits contended for by appellant in its proposition under this assignment.

In disposing of the eighth assignment it is sufficient to say that the charge of the court presented to the jury the question as to whether there was a contract between Ions and Wingfield; and if the appellant had desired an instruction broader than that given by the court, it should have requested it. It is a rule of this court, supported by authority, that a mere suggestion to the trial court is not sufficient to require the court to submit an issue to the jury, that a charge should be requested, properly framed, presenting the question desired to be passed upon. Gulf, C. & S. F. Ry. Co. v. Minter, 42 Texas Civ. App., 234, and cases there cited; Missouri, K. & T. Ry. Co. v. Smith, 45 Texas Civ. App., 128. In the first case mentioned, a writ of error was refused.

Our findings of fact dispose of the questions raised under the ninth assignment of error, with the exception of the objection urged to the judgment on account of the interest allowed. The interest allowed on a claim of this character would be six percent, and is allowed only from the date that the amount would mature or be due. The policy provides that the loss shall be payable 60 days after proof of loss. The verdict and judgment allowed interest from the date that the fire occurred. This policy would mature within 60 days after proof of loss. The evidence does not show that any proof of loss was furnished, but it was dispensed with by the absolute refusal of the Insurance Company to pay, wherein they expressly denied liability, and this was upon the 25th day of April, 1906. We are inclined to think that this objection is well taken, and that interest should commence to run from this last date and not from the day that the property was destroyed.

The judgment in this respect will be reformed, and, as reformed, will be affirmed for the principal amount found by the jury, with

interest thereon from the 25th day of April, 1906, at the rate of six percent per annum.

Costs of this appeal are taxed against the appellee.

*Reformed and affirmed.*

Writ of error refused.